No. 37,485

MID-CONTINENT GRAIN COMPANY, *Appellee,* v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY and FRANK A. THOMPSON, Trustee, *Appellants.*

(203 P. 2d 141)

Opinion filed March 5, 1949.

*Edward M. Boddington,* of Kansas City, and *Thomas E. Deacy,* of Kansas City, Mo., argued the cause, *J. O. Emerson, Edward M. Boddington, Jr.,* both of Kansas City, *William F. Milligan, Clifford B. Kimberly,* both of Kansas City, Mo., *M. G. Roberts* and *E. G. Nahler,* both of St. Louis, Mo., were with them on the briefs for the appellants.

*Grant W. Harrington,* of Kansas City, argued the cause, and *W. K. Ward,* of Kansas City, with with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This is an appeal by the St. Louis-San Francisco Railyway Company and Frank A. Thompson, its trustee, from a money judgment rendered against them for loss of wheat in transit.

Five carloads of wheat, which were water-soaked in an attempt to extinguish a fire in an elevator at Fort Scott, were to be sal-

vaged. The grain was transported over defendants' railway from Fort Scott, Kan., to plaintiff, Mid-Continent Grain Company, the consignee at Kansas City, Mo. The action was in five counts and was based on evidence which showed a difference in the weight of the wheat on the date of loading, August 28, 1946, at Fort Scott, Kan., and the dates of unloading, approximately a week later. Two cars were unloaded on September 3 and three cars were unloaded on September 4, 1946, in Kansas City, Mo.

The answer contained a general denial and further alleged if there was any loss in the weight of the grain between Fort Scott, Kan., and Kansas City, Mo., ". . . then such loss in weight, if any, was directly caused by the fact that the wheat when loaded at Fort Scott, Kan., and delivered to these defendants for shipment was water-soaked and any loss of weight in the course of transit was directly due to the drainage of water from said shipment and as a direct result of natural shrinkage under all of the facts and circumstances, and that the same amount of wheat which was loaded into the various cars described in the various counts of plaintiff's petition was duly delivered by these defendants unto plaintiff at Kansas City. . . ."

The reply denied the allegations contained in the answer.

In the opening statement of counsel for plaintiff it was, in substance, stated: The wheat was so water-soaked and caked it could not be run over the belts ordinarily used for loading purposes and plaintiff therefore brought its portable elevator from Kansas City into which the wheat was shoveled and elevated into the railroad cars; the fire in the elevator broke out on August 24 and the loading began August 26, was completed on the 28th and the wheat reached Kansas City, Mo., on the 29th; the wheat was there unloaded from two cars on September 3 and from three cars a few days later; the claimed loss in grain was based on the difference in its weight at Fort Scott and its weight at the point of destination in Kansas City, Mo., less one-eighth of one percent of the loading weight allowed on the bills of lading for natural shrinkage.

The action was tried by the court, a jury having been waived. Plaintiff's evidence consisted of the single deposition of the witness, John Stark, president of the plaintiff company. Attached to his deposition were photostatic copies of the following instruments:

(1) Five bills of lading issued at Fort Scott dated August 28, 1946, each of which disclosed the weight of the wheat in the car and that it was damaged grain.

(2) Five duplicate copies of grain inspection certificates purporting to be issued by the Missouri grain warehouse department dated August 29, 1946, each disclosed the moisture content of the grain to be twenty-three percent and the further description of the grain —"Sple [or Spld] Gr Hd W Wheat" and "Heating Sour"—except one copy which did not contain the words, "Heating Sour."

(3) Five duplicate copies purporting to be weight certificates of the grain warehouse department of the state of Missouri indicating the pounds of grain removed from each car and that it was weighed in a hopper scale. These instruments showed two cars were weighed and unloaded at the plaintiff's place of business on September 3, 1946, and that three cars were weighed and unloaded there on September 4, 1946. Under the heading "Remarks" one of them contained the word, "Leak." Under the same heading the other four cars were described as, "Car condition investigated and found O. K."

(4) A chart prepared by the witness, Stark, which showed loading weight of each car of grain at Fort Scott, unloading weight thereof at Kansas City, the shortage in weight at Kansas City, the natural shrinkage based on one-eighth of one percent of the loading weight, the bushels and pounds, the value per bushel, the value of the total shortage, the amount of the freight and the loss claimed on each car.

(5) Five claims of loss filed by plaintiff containing figures and data based on the chart prepared by plaintiff's witness as shown in No. 4 above.

The direct examination of the witness, John Stark, as disclosed by his deposition, in substance, was: He was president of the plaintiff company and he came into possession of a number of carloads of damaged wheat which had been in a fire at Fort Scott; he had gone to Fort Scott and had arranged to load the salvage wheat; the principal part thereof was loaded by portable conveyors; he understood the wheat had been weighed at Fort Scott by the railroad company, that company accepted the wheat for shipment and issued five bills of lading therefor; the five cars were delivered to plaintiff's elevators in Kansas City and were there unloaded; when they were unloaded they were weighed by the state of Missouri; he made claim to the "railroad company" for loss and damage as indicated in No. 5 above; the value per bushel of the grain in one car was $1.82 and in four cars it was $1.74; in figuring the claims for loss the quantity of the loss was based on the railroad weight at Fort Scott less the difference in weight at Kansas City, less one-

eighth of one percent, which he thought was a statutory deduction for loss in transit; he made the chart (see No. 4 above) which showed the basis on which the claims were figured.

Defendants objected to exhibits contained in No. 3 and No. 4 above on the ground that the exhibits contained in No. 3, which formed part of the basis for the chart in No. 4 above, had not been sufficiently identified, constituted heresay, were in nowise binding on defendants and constituted conclusions of the witness. The court did not pass upon these objections but stated:

"Very well, I will keep the objections in mind. This being tried by the court without a jury, of course the Court will not consider anything he doesn't believe to be competent."

On cross-examination the witness, in substance, testified: He inspected the grain after the fire; a great deal of water had been poured into the head house; when he arrived the wheat was wet; plaintiff loaded the wheat into the five cars; he was there most of the time and inspected the cars before the wheat was loaded; he found no defects or holes in any of the cars; he inspected the grain doors after they were installed and saw the cars after they were loaded; he saw no evidence of any wheat being lost from the cars; after the wheat reached Kansas City it was unloaded at plaintiff's elevator; it was necessary to dry it out before it was in condition to be sold; it was sold after it was dried; in the drying process after water evaporated the wheat naturally lost weight; the wheat was wet and was not sold on the market at Kansas City.

Defendants demurred to the foregoing evidence of the plaintiff on the ground it failed to establish a cause of action. The demurrer was overruled.

Defendants offered the testimony of the following: Sam Ayers, fire chief of the city of Fort Scott; Dale Goodrick, general superintendent of the Goodlander Mills at Fort Scott, in whose elevator the wheat was damaged; James H. Burr, another employee of the Goodlander Mills; Bernard Lee Wasmer, a sampler and weigher employed by the Missouri state grain inspection department; H. T. Van Meter, a Missouri state grain inspector; W. R. Cole, a grain sampler of the grain inspection department of Missouri; Thomas R. Lybarger, the car inspector of the defendant railroad company.

We do not deem it necessary to narrate the detailed testimony of these various witnesses. Their testimony has been carefully examined. A brief summary of the collective testimony of the first

three witnesses named in the preceding paragraph, whose testimony pertained to the situation at Fort Scott, will first be noted. It, in substance, discloses: The fire started in the Goodlander elevator on August 23 in the top of the head house; from 6:30 a. m. until 12:00 or 1:00 p. m. five streams of water from two-and-one-half-inch hose were poured onto the fire; the wheat was thoroughly soaked; it could not be loaded in the ordinary manner and was loaded into the cars by means of a portable elevator provided by plaintiff; it was Goodrick's duty to inspect the cars, see they contained no holes, to install the grain doors, to put paper around the doors and to see the cars were in such condition they would not leak grain; Goodrick saw water running from one of the cars after the cars were loaded but could not remember the particular car; the water, in his opinion, was caused by the fact the wheat was wet; the witness Burr inspected the cars at Fort Scott; the cars were all properly prepared for the grain by an employee of the Goodlander company, the cars were all in good condition and had no holes or any openings in the floor or sides from which grain could escape; the car doors were all properly sealed; the wheat was very wet; Burr saw water running from some of the cars at the Goodlander Mill after they had been weighed by the defendant company and were in the railroad yards; he could not tell how much water had run from the cars.

Wasmer made an inspection for leaks in the cars and of the seals on the doors and made a record of the inspections; there were no leaks or holes in any of the cars except a leak in the grain door on one car (referred to as the Pennsylvania car) but he could not determine how much wheat had leaked out of that car; he examined two cars on September 3 after they were delivered to plaintiff and before they were unloaded; he examined three cars on September 4 after they were delivered to plaintiff and before they were unloaded; the seals on four cars, which were specifically described, were all unbroken and intact (the record before us does not show the witness testified specifically relative to the seal on the Pennsylvania car, which had a leak in the grain door); the seals on the cars were broken by plaintiff itself when it unloaded them; the cars were unloaded at plaintiff's elevator on the dates shown by the inspection card, namely, September 3 and 4.

Van Meter inspected the wheat in Kansas City on August 29 and found it was all heating and was sour; he resealed each car after sampling the grain; it had an abnormal moisture content of twenty-

three percent; the normal moisture content ranged from nine to fourteen percent; Cole discovered evidence of heating and excessive moisture in the wheat and that it was sour; the seals were all intact and unbroken; it was impossible for any of the doors of the cars to have been opened without breaking the seals. (His record of the seals he broke and the seals he applied after inspection was introduced in evidence.)

The only employee of the defendant railroad company who testified was Thomas R. Lybarger, a car inspector. Briefly stated, his testimony, in substance, was: Water that had been poured into the elevator during the fire came down with the wheat; the water was running out of it; each of the five cars was in "A" condition; there were no defects or leaks of any kind from which grain could escape; the doors were in good condition and had no leaks, holes or cracks in them; he examined the cars after they were loaded in the yards at Fort Scott and water was running out of all five cars; the water was coming out of the wheat that had been loaded into the cars.

The record before us discloses no examination of defendants' witnesses and no rebuttal evidence by plaintiff. There is no substantial, if any, conflict in the evidence of the parties.

Defendants first urge their demurrer to plaintiff's evidence should have been sustained and, second, that in any event the judgment for plaintiff is contrary to the uncontradicted evidence.

Touching the demurrer plaintiff argues it made a prima facie case by showing the difference in the weight of the wheat in loading and unloading. That such proof is ordinarily sufficient to establish a prima facie case seems to be true. (*Galveston, H. & S. A. Ry. Co. v. Wallace,* 223 U. S. 481, 56 L. Ed 516, 32 S. Ct. 205.) Such proof raises a presumption the wheat was lost in transit by reason of the negligence of the carrier or its agents.

The Galveston case relied upon by plaintiff is not, however, controlling under plaintiff's own evidence. In this case plaintiff's own evidence overthrew the mere presumption it relies upon. It introduced positive evidence which clearly negatived the presumption any wheat was lost in transit from at least four of the cars.

Plaintiff's evidence discloses: The wheat was water-soaked when first weighed at the point of loading; that approximately one week intervened between the date of loading and unloading within which time water could evaporate; no grain had been lost

through holes or leaks in four of the cars; the condition of those cars had been investigated in Kansas City by a neutral witness and had been "found OK"; the seals on those car doors were entirely intact when the wheat was sampled at Kansas City. This is plaintiff's uncontradicted evidence.

Assuming, however, for the moment defendants' objection to certain of plaintiff's evidence, previously mentioned, was not good and assuming further, the demurrer was properly overruled, what do we have? We need not repeat the evidence of defendants' wholly disinterested witnesses or of its own unimpeached single employee. That evidence overwhelmingly and without contradiction disclosed: No wheat was lost in transit by reason of leaks or holes in four cars; the seals on the doors of those cars were all examined after the cars had been delivered to plaintiff and before they were unloaded; the seals were all intact at that time; the cars were not unloaded by someone else but by the plaintiff; the intact seals were broken *by plaintiff at its elevator* on September 3 and 4.

Our research has revealed no case, and none is cited by plaintiff, which allows recovery for wheat lost in transit under such circumstances.

The bills of lading showed this was spoiled grain in all five cars. Plaintiff's own evidence showed it was water-soaked when loaded. Courts take judicial notice of the natural shrinkage of grain in transit. (*Cardwell v. Railroad Co.,* 90 Kan., 707, 136 Pac. 244.) Surely they will take judicial notice of shrinkage of water-soaked grain. Under such circumstances the proof alone of a difference in weight at points of loading and unloading does not establish a prima facie case. *A fortiori* a prima facie case is not established when in addition to the fact water-soaked grain was being shipped plaintiff's own evidence further disclosed no grain was lost from the cars by reason of holes or leaks in the cars and that the seals on the doors were intact at the time plaintiff unloaded the grain at its elevator. After such facts were developed by plaintiff's own evidence the burden was upon it to prove by a preponderance of the evidence that grain had been lost from the cars and the actual extent of such loss. (*Nye-Schneider-Fowler Co. v. Chicago & N. W. R. Co.,* 106 Neb. 149, 182 N. W. 967.) Otherwise the judgment would be based upon pure speculation and conjecture.

This judgment cannot be affirmed on the ground the court dis-

believed, or may have disbelieved, certain material evidence as, for example, that the wheat was *water-soaked* when loaded. That was plaintiff's own uncontradicted evidence. It was confirmed by defendants' witnesses. The trial court also stated there was no evidence as to the condition of the seals at the time of unloading. The uncontradicted evidence before us, as previously mentioned, is to the contrary.

There is some merit in defendants' contention that recovery should not be allowed for loss of grain from the one car involved in the first cause of action. A careful examination of the record leads us to believe a prima facie case was probably established with respect to that cause of action, although there was no direct evidence any grain was lost by reason of the small defect in the inside grain door. We have concluded to let the judgment as to that cause of action stand.

The judgment on the remaining four causes of action is reversed.

SMITH, J., dissents from that part of the opinion which reverses the judgment as to the last four causes of action.

ARN., J., not participating.